THE PACIFIC MAIL STEAMSHIP COMPANY, Respondent, *v.* THE PANAMA RAILROAD COMPANY, Appellant.

*Insolvency — release from the obligation of a contract — common carriers — contracts giving equal, but not exclusive privileges.*

The fact that one party to an agreement has reason to fear the insolvency of the other party thereto, is not sufficient to release him from the agreement, the consideration of which he has received.

An agreement was entered into between the Panama Railroad Company and the Pacific Mail Steamship Company whereby the Panama Railroad Company granted and conveyed unto the Pacific Mail Steamship Company all and singular the docks, wharves, piers, structures, lighters, loading and unloading facilities, appurtenances and appliances, afloat and ashore, used, owned or controlled by it in its said Central American line about and for each and every port upon the said Pacific ocean between the ports of Panama and Acapulco, to have and to hold the same unto the said Pacific Mail Steamship Company, its successors and assigns forever.

The second article of said agreement provided as follows, the Panama Railroad Company "further hereby grants, sells, assigns and conveys unto the said Steamship Co., its successors and assigns, entirely and absolutely its good will in the service and carrying trade between the said ports of Panama and Acapulco, and any and every intermediate point on the Pacific ocean, and between any and every one or more of such intermediate ports, and it hereby, for itself, its successors and assigns, covenants and agrees to and with the said Steamship Co., its successors and assigns, that it shall not and will not at any time or times hereafter engage, directly or indirectly, or in any manner concern itself in carrying on or conducting any service whatsoever by vessel in whatsoever manner propelled from any of such ports to any one or more of the others thereof lying between the said ports of Panama and Acapulco."

*Held,* that by the transfer of the good will of the business mentioned in said agreement the Panama Railroad Company did not undertake to give exclusive

privileges to the Pacific Mail Steamship Company in reference to the issuing of through bills of lading for merchandise to be transported upon the railroad of the defendant in respect to business, as between the ports of Panama and Acapulco and intermediate ports;

That an attempt on the part of the Panama Railroad Company to confer exclusive privileges in reference to bills of lading upon another company was in violation of its sale of the good will of the business to the Pacific Mail Steamship Company; that the true construction of such agreement between the parties was that no exclusive privileges in reference to the business which was the subject-matter of the agreement should be given to other parties;

That the Pacific Mail Steamship Company should be upon at least an equal footing with any other corporation operating connecting lines, and that the Panama Railroad Company should refrain from making any arrangement with any other company conducting steamship service between Panama and Acapulco, or any intermediate port, for the purpose of diverting the business between Panama and Acapulco from the Pacific Mail Steamship Company, but that it was not intended that the Panama Railroad Company should give the Pacific Mail Steamship Company the privilege of fixing the rates of transportation over the road of the Panama Railroad Company.

APPEAL by the defendant, The Panama Railroad Company, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 28th day of December, 1894, upon the decision of the court rendered after a trial at the New York Special Term, and also from an order made at the New York Special Term and entered in said clerk's office on the 24th day of December, 1894, granting the plaintiff an extra allowance.

*F. R. Coudert* and *W. J. Curtis,* for the appellant.

*E. Lauterbach,* for the respondent.

VAN BRUNT, P. J.:

The plaintiff is a domestic corporation organized and existing under chapter 266 of the Laws of 1848, and the acts amendatory thereof, for the purpose of building, purchasing and operating a line or lines of vessels to be propelled solely or partially by the power or aid of steam or other expansive fluid or motor power, and to be run and propelled in navigating the Atlantic and Pacific oceans. The defendant is also a domestic corporation organized and existing under chapter 284 of the Laws of 1849, and the acts

amendatory thereof, for the purpose of constructing and maintaining a railroad with necessary appurtenances across the Isthmus of Panama, and of purchasing and navigating such steam or sailing vessels as may be proper and convenient to be used in connection with the railroad to be constructed. Ever since its incorporation the plaintiff has operated lines of steamships between the Isthmus of Panama and the port of San Francisco on the Pacific ocean, and between the city of New York and the port of Aspinwall or Colon on the Atlantic side of the isthmus. The Pacific service has included and still includes various intermediate ports between and inclusive of Panama on the south and Acapulco on the north. Since 1885 the defendant has operated its line of railroad between the ports of Colon and Panama, transferring freight, passengers and mail between those points, which was almost wholly destined for points and places beyond the isthmus, and a great part of the freight and a large proportion of the passengers transported by the defendant have been carried beyond the isthmus by the plaintiff company. In 1870 the defendant, pursuant to powers granted by its charter, established a line of steamships running between the ports of Panama and Acapulco, stopping at intermediate points, which line was known as the Central American line, and continued to operate until the making of the agreement hereinafter mentioned on or about the 1st of October, 1872.

Prior and up to the making of this agreement between the plaintiff and the defendant in 1872, agreements existed between the defendant and certain connecting lines, including the plaintiff, for the issuance of through bills of lading and for favorable rates for the carriage of merchandise from, to or through said ports by such connecting lines. On the 1st of October, 1872, a formal agreement was entered into between the plaintiff and the defendant whereby the defendant sold to the plaintiff this Central American line, including the ships used therein and their appurtenances afloat and ashore, and its service, business and good will for the price of $700,000 in cash.

By the first article of this agreement the defendant " grants, sells, assigns and conveys unto the said Steamship Co. (the plaintiff) all and singular the docks, wharves, piers, structures, lighters, loading and unloading facilities, appurtenances and appliances,

afloat and ashore, used, owned or controlled by it in its said Central American line about and for each and every port upon the said Pacific ocean, between the said ports of Panama and Acapulco, to have and to hold the same unto the said Pacific Mail S. S. Co., its successors and assigns forever."

By the second article of said agreement the defendant "further hereby grants, sells, assigns and conveys unto the said Steamship Co. (the plaintiff), its successors and assigns, entirely and absolutely its good will in the service and carrying trade between the said ports of Panama and Acapulco, and any and every intermediate port on the Pacific ocean, and between any and every one or more of such intermediate ports, and it hereby, for itself, its successors and assigns, covenants and agrees to and with the said Steamship Co., its successors and assigns, that it shall not and will not at any time or times hereafter engage, directly or indirectly, or in any manner concern itself in carrying on or conducting any service whatsoever by vessel in whatsoever manner propelled from any of such ports to any one or more of the others thereof lying between the said ports of Panama and Acapulco."

From the time of the execution of this agreement until the 25th of August, 1875, there appeared to have been various agreements, written and verbal, entered into between the parties to this action regulating the conduct of the business which was being transacted by them, and the prices to be realized therefor. On said 25th of August, 1875, an agreement in writing was entered into between the parties to this action, the first paragraph of which is as follows : "All agreements, written or verbal, heretofore made between the parties hereto, are hereby abrogated and terminated by the consent of both parties hereto, and all business between the parties after the 31st day of March, 1875, to be done and settled for under this agreement, provided that all business prior to March 31st, 1875, is to be settled for under the then existing agreement."

It is evident when we consider the balance of the agreement that it was not the intention of the parties to abrogate every and all written agreements which had been entered into between them, and that it was not intended to abrogate the agreement of 1872, above referred to, and that the only agreements which it was intended to do away with were those regulating the traffic between the two

companies, because it will be seen upon an examination of the agreement of August 25, 1875, that it relates solely to details regulating the traffic of the two companies and the division of the moneys received therefor.    This agreement provided that it should continue in force for five years unless sooner terminated by the giving of a notice by either party of. its intention to terminate the same in three months from the .date of the giving of such notice.

On the 27th of August, 1875, a supplemental agreement was made embracing a branch of the same subjects.

Prior to November, 1875, serious disagreements had arisen between the Panama Railroad Company and the Pacific Mail Steamship Company, and in consequence thereof the railroad company had attached the ships of the steamship company for debt due it, and was threatening to take possession of its ships by which it carried on its business between New York and Aspinwall.

In January, 1876, the defendant railroad company entered into an agreement with one Clyde, living in Brooklyn, whereby it was agreed that said Clyde should, during the existence of the contract, act as the sole and exclusive agent of the defendant at New York and at San Francisco and at all other ports or places to or from which steam vessels might be run by said plaintiff during the continuance of said contract, and that Clyde should have the exclusive right to issue all through receipts and bills of lading, and all through passenger tickets, etc.    The contract between Clyde and the railroad company gave to Clyde the advantages which the Pacific Mail Company had formerly enjoyed, and practically enabled him to control the carrying business between New York and San Francisco by way of the Panama railroad, which contract was transferred to the Panama Transit Steamship Company, and was, on the 13th of November, 1876, in full force and effect.

On the 31st of May, 1876, the Panama Transit Steamship Company granted to the Pacific Mail Company certain benefits secured to it by its contract of January, 1876, with the railroad company, upon condition that there should be an equitable division between the parties of the profits of the business, etc.    Thereupon the transit company, with the consent of the railroad.company, granted to the Pacific Mail Company an equal interest in the benefits and advantages therein specified and granted, to endure until the 1st day of

October, 1879.   On the 13th of November, 1876, a traffic agreement was entered into between the Panama Railroad Company of the first part and the Pacific Mail Company, and the Panama Transit Steamship Company of the second part.   At the time of the making of this agreement, the Pacific Mail Steamship Company was largely indebted to the Panama Railroad Company, and one of the provisions of the agreement was that its net earnings should be applied each month by the transit company towards the payment of the indebtedness of the Pacific Mail Company to the Panama Railroad Company.   This agreement made between the defendant, the plaintiff and the transit company continued to endure until the month of February or thereabout.

On the 1st of February, 1878, another formal agreement was entered into between the parties to this action, in which the purposes of the organization of the railroad company are recited, and that in order to secure to said railroad the permanent and regular control of the business which naturally sought the isthmus, and to prevent the embarrassments, delays and loss of business which it had in past times suffered by reason of its want of control of the management of the main ocean line, from and through which its principal business was derived, it had been found necessary, proper and convenient for said railroad company to own or control such ships and property as were necessary for a continuous line between San Francisco and New York and to and from such other ports in connection with said isthmus as its business might from time to time demand.   And after further reciting that said steamship company, meaning the Pacific Mail Steamship Company, was then engaged in business on both the Atlantic and Pacific oceans, and was running a regular line between San Francisco and certain ports northward thereof and New York, and also a branch line to certain Central American and Mexican ports, which business was valuable to it, and that it was desirous of arranging for a continuance of the same on a permanent basis in connection with said railroad company, and was also desirous to procure from said railroad company the means necessary to purchase the steamships of the Panama Transit Steamship Company, and the rights and privileges which said transit company then enjoyed by reason of the contract with said railroad company whereby a large and valuable portion of the

business of said steamship company was lost to it, etc., the steamship company (the plaintiff) agreed to sell and deliver to the railroad company (the defendant) certain steamships and other property for a price therein named, and further agreed in respect to the maintenance of the steamship service for the full term of fifteen years from the date of the agreement, to pay to the railroad company certain sums of money and proportion of earnings arising from transportation.

It was also provided, amongst other things, in said agreement of February, 1878, that said steamship company should have the exclusive right to issue all through receipts and bills of lading, and all through passenger tickets between all ports and places, to and from which steam vessels might be run by the steamship company to the railroad and in connection therewith, and that the said company should attend to and perform all the ordinary duties appertaining to such agency; but that said agency of the steamship company should not extend to either of the ports of Panama or Aspinwall.

It was also provided by said agreement that, under certain contingencies, the railroad company might declare that the agreement of the 1st of October, 1872, made between the parties thereto with respect to certain business on the Central American and Pacific coast, should be abrogated and that the same should thenceforth be absolutely void.

During the continuance of said agreement of 1878 the plaintiff made an agreement with eighteen railroad companies known as the Trans-Continental Association, the business of which entered largely in competition with the business of the defendant company, and had abandoned the practical control entirely so far as its through business was concerned between New York and San Francisco to the Trans-Continental Association and had agreed that it would not run more than three ships per month between New York and Aspinwall on the Atlantic ocean, and between Panama and San Francisco on the Pacific ocean, in consideration of which it was to receive the sum of $75,000 per month from the Trans-Continental Association, which payment enabled it to carry out its agreement above referred to, and to make its monthly payment to the Panama Railroad Company.

Some months prior to the termination of the agreement of 1878, by its own limitation, negotiations were initiated between the parties with the expectation and hope of effecting some new contract for the adjustment of their relations and for their mutual good, and an agreement was in fact reached, when, shortly prior to the time when the contract was to be executed, the Pacific Mail Company declared that it had become unable to guarantee any fixed sum of business and to make the cash payment which had constituted one of the principal conditions of the former agreement. The Pacific Mail Company was induced thus to withdraw from the conditions orally agreed upon by a notification received from the Trans-Continental Association that it would no longer continue its monthly allowance. Without this aid the Pacific Mail Company was unable, it asserted, to stipulate any fixed payment, and it, therefore, insisted that the conditions of the contract should be accordingly modified. The Pacific Mail Company was not at this period in prosperous circumstances and was slow in paying its debts. Notwithstanding this fact efforts were made in good faith by the defendant to arrive at some just agreement which would secure the rights of the company and enable it to go on harmoniously, but the parties finally split upon the question as to who should have the right to make the rates, it being insisted by the railroad company that it could not safely permit the steamship company so to do, and the steamship company refusing to abdicate its right, real or supposed, to fix the rates in favor of the railroad company.

Prior to the 1st of February, 1893, the day of the termination of the agreement of February, 1878, by expiration of time, the defendant notified the plaintiff that it would not permit it on and after said February 1, 1893, to issue through bills of lading, and the defendant sought to find some other corporation that was able and willing to act as its agent in the procuring of business and in the issuing of through bills. The Chilian Steamship Company was organized and had had business relations with the railroad company as the carrier of freight and passengers between Chili and Panama, and with that company negotiations were commenced by the defendant, and were pending but undetermined at the time of the issuing of the injunction in this action, for a traffic agreement which would have conferred upon the Chilian Company certain exclusive privi-

leges in reference to its business with the defendant company which would necessarily give it an advantage in the transaction of such business, but it was not intended to make any discrimination against the Pacific Mail Company in respect to the privileges enjoyed by it from those enjoyed by all other persons or corporations in the world excepting such Chilian Company.

This action having been commenced by the plaintiff and an injunction issued, as above referred to, the negotiations with the Chilian Company ended.

Upon the trial of the action, the foregoing facts appearing, judgment was directed in favor of the plaintiff enjoining the defendant from entering into any agreement with the Chilian Company or with any other company, or with the owner of any vessel for transportation by sea of goods, passengers or mail, between the ports of Panama and Acapulco; and substantially enjoining the defendant from entering into any arrangement with any other company than the Pacific Mail Company for the issuance of through bills of lading. And from the judgment thereupon entered this appeal is taken.

The question which is presented upon the admitted facts in the case at bar is, does the plaintiff enjoy the exclusive privilege of issuing through bills of lading for merchandise to be transported upon the railroad of the defendant in respect to business as between the ports of Panama and Acapulco and intermediate ports?

It is claimed upon the part of the plaintiff that at the time of the execution of the contract in 1872, by which the defendant company conveyed to the plaintiff the vessels, business, service and good will of the Central American line, the custom and agreement as to through bills of lading were well established, as was also the right to make through rates upon a divisional basis; and it is urged that by the agreement of 1872 the plaintiff bought this right of the defendant and is the owner thereof. Upon the other hand, the defendant claims that no such construction can be placed upon the agreement of 1872, and, if it could, that that agreement had been abrogated by the subsequent agreements between the parties and the course of business which they entered into seemingly regardless of the provisions of that agreement.

It seems to us, however, upon an examination of the dealings between the plaintiff and the defendant, and the other agreements

entered into between the parties, that it cannot be found as a matter of fact that the agreement of 1872 was ever abrogated, but that it was, and is, a binding and subsisting agreement. As has been already observed, if we considered only the language of the agreement of August 25, 1875, it might be held that the agreement in question was abrogated. But when we consider the nature of the agreement of 1875 and the purposes to be attained by it, it is manifest that it was not the intention to interfere with the substantial provisions of the agreement of 1872. And when we take into account the language of the agreement of 1878 there seems to be no further doubt on this subject, because the existence of the agreement of 1872 is expressly recognized, in the agreement of 1878, and the right is reserved by the defendant to terminate the former agreement under certain contingencies. If the agreement of 1872 had already been abrogated and was of no effect, such a provision would certainly not have been inserted in the agreement of 1878. From 1878 to the present time nothing has transpired which would indicate an intention upon the part of the parties to the agreement of 1872 to terminate the same.

We must thus determine the rights of the parties to this litigation by the provisions of the contract of 1872; and the question is, whether, by the transfer of the good will of the business referred to in that agreement, the railroad company undertook to give exclusive privileges to the plaintiff in reference to the issuing of through bills of lading.

As has already been intimated, it is claimed upon the part of the plaintiff that because the defendant, at the time of the entering into of the agreement of 1872, had arrangements with other companies for the issuing of through bills of lading, that under such agreement it has succeeded to all the privileges of those other companies. We have been unable to find any provision in the agreement in question which bears out any such claim. It would seem that at this time companies other than the Central American line were issuing through bills of lading under arrangements of a temporary character, revocable by notice given by either party, and all that the defendant company agreed to transfer to the plaintiff were the privileges which were being enjoyed by the Central American line,

402 PACIFIC STEAMSHIP CO. *v.* PANAMA R. R. CO.

and certainly nothing beyond that. It was the good will of that business which was transferred and nothing more. What the defendant's arrangements with other companies were at this time was of no concern to the plaintiff, and no contract was made in respect thereto. In fact, when we come to consider the second paragraph of the agreement of 1872, it might well be claimed that all that the Panama railroad covenanted not to do was that it should not at any time or times thereafter, directly or indirectly, in any manner concern itself in carrying on or conducting any service whatsoever by vessel in whatsoever manner propelled, from any of such ports to any one or more of the others thereof, lying between said ports of Panama and Acapulco.

It seems to us, therefore, that it would be a stretching of the terms of this arrangement to hold that exclusive privileges in reference to the transaction of business with the Panama Railroad Company were intended thereby to be given to the plaintiff. It would certainly be extending the meaning of the words " good will " to an extent which has never heretofore been done, by giving the words in this contract the broad and comprehensive construction which is claimed upon the part of the plaintiff.

Undoubtedly the attempt on the part of the defendant to confer exclusive privileges upon the Chilian Company was a violation of its sale of the good will of this business to the plaintiff. Simply because the Panama Railroad Company might have fears in regard to the solvency of the Pacific Mail Steamship Company, it cannot be relieved from its agreement, the consideration of which it has received and the performance of which upon its part must, therefore, necessarily continue.

It seems to us that the true construction of the agreement of 1872 between these parties is that no exclusive privileges in reference to the business which was there the subject-matter of agreement should be given to other parties; that at least the plaintiff should be upon an equal footing with any other corporation operating connecting lines, and that the railroad company should refrain from making any arrangement with any other company conducting steamship service between Panama or Acapulco, or any intermediate port, for the purpose of diverting the business between Panama and Acapulco from the plaintiff's Central American line;

but that it was never intended to give the plaintiff the privilege of fixing the rates of transportation over the defendant's road, which would be the result of the construction contended for.

We think that the injunction contained in the judgment was too broad, and that it should be modified in accordance with this opinion and as modified affirmed, without costs to either party.

PARKER, J., concurred.

Judgment modified as directed in opinion and affirmed as modified, without costs to either party.